## A11A0240. RIDGEWAY v. THE STATE.

(712 SE2d 84)

SMITH, Presiding Judge.

Nathaniel Ridgeway appeals from his conviction of theft by receiving stolen property, asserting that insufficient evidence supports his conviction. We disagree and affirm.

Viewed in the light most favorable to the jury's verdict, the record shows that the victim reported to the police that a yellow motorcycle had been stolen from his garage. The "49cc dirt bike" stood only "a couple of feet from the ground,"was brand new at the time it was stolen, and had been purchased by the victim for his young children.

The next day, the officer who responded to the theft report received a dispatch about "individuals riding a motorbike" two to three miles away from where the dirt bike had been stolen. When the officer arrived, he saw Ridgeway riding a yellow dirt bike that matched the description of the one that had been stolen the day before. Upon request, Ridgeway verbally gave the officer his personal information and explained that he had received the dirt bike from someone named "Joe."[1]

The officer asked the victim to come look at the dirt bike and released it to the victim after the victim identified it as the one that had been stolen the day before. The victim testified the dirt bike "was almost demolished . . . it was just in pieces, plastic was broken on it, the muffler was pulled off of it, the kickstand was broken, [and] the brakes were broken." After the victim claimed the dirt bike, the officer arrested Ridgeway. Ridgeway was 19 years old at the time of his arrest.

Ridgeway testified that he saw someone riding the yellow dirt bike for the first time the night before he was arrested. He testified that he woke up around 11:00 a.m. the next morning and smoked a cigarette on his front porch with Sean and Marcus Jackson. When a person Ridgeway referred to as "Moe"[2] pulled up approximately 15 minutes later on the yellow dirt bike, the Jacksons and Ridgeway asked if they could ride it. Ridgeway rode first and saw his friend, Jahmal Woodley, after he had been riding for a couple of minutes. Woodley "was walking down the street coming from Alika's . . . house," and Ridgeway talked with him for about 20 seconds about

---

[1] The officer's incident report identified "Joe" as the name of the person from whom Ridgeway obtained the dirt bike.

[2] The police officer acknowledged during cross-examination that "Joe and Moe sound a lot alike," and also agreed with defense counsel's statement that maybe Ridgeway "mumbled or misspoke and meant Moe, he could have . . . said Joe or you could have misheard Joe, when he actually said Moe."

how Woodley had just ridden the dirt bike. About 30 seconds after Ridgeway resumed riding the dirt bike, he was stopped by the police. Ridgeway asked Woodley to tell his parents he was "in trouble" while he was sitting in the back of the police car. He also asked him to "find Moe or something, because we was in [an] emergency situation."

Ridgeway testified that he told the police officer about Moe because he "didn't want to get arrested for something that I didn't know really anything about." He testified that he did not notice anything about the dirt bike that made him think it might have been stolen. And, he had seen Moe "on more than three to four dirt bikes" in the neighborhood. He "never knew if any of them were stolen. . . . We never, I mean, asked him, because we wouldn't think that it was stolen or anything like that." Although he had known his "good friend" Moe for "about two years," he did not know his last name or his phone number. He did know the last name of the three other friends who were with him that morning.

Although Ridgeway knew the specific house in which Moe lived and told the officer he could lead them to Moe's house, he never gave information about Moe's address to the police or attempted to locate Moe after his arrest. He claimed that he "heard from all the kids in the neighborhood that they haven't seen him since the arrest. So really we was thinking that he just ran, cause we — he don't — he probably didn't know he stole it so he didn't want to get in trouble." Ridgeway testified that he never saw Moe again after the day he was arrested.

Marcus Jackson testified that he and his cousin Sean Jackson were at Ridgeway's house around 12:00 p.m. when Moe "came around the corner on a little mo-ped, the motor scooter." He identified Moe as "[a] friend in the neighborhood who stay right around the street from me." Marcus Jackson and Ridgeway asked to ride the dirt bike, and Ridgeway took his turn first. Three minutes after Ridgeway started riding, Jahmal Woodley "came from around the corner where [Ridgeway] was," and told them that Ridgeway had been arrested. After hearing this information, Moe walked away and Marcus Jackson never saw him again. Jackson testified that Moe was approximately 20 years old.

Sean Jackson testified that when he and Marcus Jackson were at Ridgeway's house, Moe drove up, "and he was asking us, did we want to ride it, because it was good looking, new. So Jahmal hops on the bike first and brings it back down. Nathaniel hops on the bike. In less than three minutes, the police all up — all up at the top of the street. . . ." He learned that Ridgeway had been arrested from Woodley, saw Moe walk away, and never saw him again. Ridgeway denied that Woodley was at his house the morning of his arrest as

related by Sean Jackson.

Jahmal Woodley testified that he first saw the dirt bike when Moe brought it to his house around 9:00 or 10:00 a.m. He testified that he knew Moe from the neighborhood for two years. He asked if he could ride the dirt bike and rode it for approximately 15 or 20 minutes going "around the neighborhood like a good two or three times." After taking his ride, he gave the dirt bike back to Moe at Alika's house. Immediately afterward, he saw Ridgeway riding the bike and then saw Ridgeway with two or three police officers. After Ridgeway was arrested, Woodley went to Moe's house, but "[n]obody came to the door" and he never saw Moe again.

Ridgeway asserts this evidence is insufficient to support his conviction because the State failed to prove that he knew or should have known that the dirt bike had been stolen. We disagree.

> A person commits the offense of theft by receiving stolen property when he receives . . . stolen property which he knows or should know was stolen unless the property is received . . . with intent to restore it to the owner. "Receiving" means acquiring possession or control or lending on the security of the property.

OCGA § 16-8-7 (a).

> In a theft by receiving case, guilty knowledge is not shown by mere possession of the goods. However, possession coupled with other circumstances and evidence may be used to infer the knowledge required by statute. Knowledge may be inferred from circumstances which would excite the suspicions of an ordinarily prudent man. Whether the explanation of the possession offered by the defendant in his statement alone is a satisfactory explanation, is a question for the jury.

Beadles v. State, 151 Ga. App. 710 (1) (261 SE2d 447) (1979).

In this case, the State did not rely solely upon mere possession to support its case against Ridgeway. It also presented additional evidence from which the jury could infer that Ridgeway knew or should have known that the dirt bike was stolen. Specifically, evidence that the "brand new" dirt bike had been physically abused in a manner inconsistent with ownership in a 24-hour period and that it had been borrowed from an alleged "good friend" with an unknown last name who disappeared after Ridgeway's arrest. See Turntime v. State, 206 Ga. App. 226, 227 (1) (424 SE2d 877) (1992) (affirming theft by taking conviction based in part upon poor state of

repair of stolen late model car upon recovery and defendant's "testimony that he had borrowed the car from a person he barely knew whose last name he did not know"). The jury could have inferred that Ridgeway was not being truthful from the inconsistencies in the testimony of Ridgeway, Woodley, and the Jacksons about what transpired that morning, their lack of knowledge of Moe's last name but knowledge of one another's last names, and Moe's alleged immediate disappearance after living in the neighborhood for two years. See *Battle v. State*, 244 Ga. App. 599, 602-603 (1) (536 SE2d 273) (2000) (jury could conclude only reasonable hypothesis was defendant's guilt based upon inconsistencies and implausibility of defendant's testimony).

*Judgment affirmed. Mikell and Dillard, JJ., concur.*

DECIDED JUNE 15, 2011.

*Teresa L. Smith*, for appellant.

*W. Kendall Wynne, Jr., District Attorney, Anne M. Kurtz, Assistant District Attorney*, for appellee.